IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | CR No. 2:10cr186-MHT |
| | ) | |
| MILTON E. McGREGOR, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF OF MILTON McGREGOR REGARDING GOVERNMENT
DUTY TO PROTECT, AND NOT TO INVADE THE PRIVACY OF,
NONPERTINENT AND PRIVILEGED PRIVATE COMMUNICATIONS**

The question before the Court on the present dispute is, what should happen with the recordings of intercepted communications that have not yet been turned over to the defense. The Government's position, as we understand it, is that the Government has already turned over those intercepted recordings it deems "pertinent" communications. The recordings that have been withheld, and are thus the subject of this Court's inquiry, we are told by the Government, are recordings deemed "nonpertinent" and/or "privileged."

There are two aspects of this question: (1) When those recorded communications should be turned over to the person from whose telephone they were recorded. The answer is "immediately." (2) Whether Government agents should be authorized to listen to these "nonpertinent" and/or "privileged" recordings and then possibly to disseminate them. The answer is "no."

It is important to look, when answering the second query in particular, to concerns facing the Congress when it undertook to draft and enact into law the Omnibus Crime Control and Safe Streets Act of 1968 ("the Act"). This legislation was a reaction, in part, to the U.S. Supreme Court's decision in Berger v. New York, 87 S. Ct. 1873, 388 U.S. 41 (1967) which declared unconstitutional the New York State statute authorizing electronic eavesdropping by law-enforcement officers investigating certain types of crimes. The Court held that the New York statute, on its face, failed to meet certain constitutional standards. Title III of the Act was drafted to address and protect those constitutional standards. See Senate Report No. 90-1097 (April 29, 1968), 1968 U.S.C.C.A.N. 2112, 1968 WL 4965. In discussing the need for Title III the Senate Committee on the Judiciary first illuminated the constitutional concerns driving the drafting of the Act, and the need for the type of constitutional protections absent within the New York State statute struck down in Berger:

> The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage. The Report of the President's Commission on Law Enforcement and Administration of Justice, 'The Challenge of Crime in a Free Society' (1967), concluded that 'the present status of the law (relating to wiretapping and electronic surveillance) is intolerable.' 'It serves,' the Report observed, 'neither the interests of privacy nor of law enforcement'

Id. at 2154.

Clearly, then, the thrust of Title III, the set of statutes involved here, was not to bestow some right upon Government prosecutors and agents, the "recorders" as it were, but rather to protect the fundamental constitutional rights of those who might be subjected to "widespread use and abuse of electronic surveillance techniques." Viewed in this light, query 2, whether Government agents should be authorized to listen to these "nonpertinent" and/or "privileged" recordings and then possibly to disseminate them, might best be rephrased to ask, "Who is in a better position to protect the Defendants' constitutional rights with regards to these recordings, the prosecutors who intercepted the recordings in the first place, have held on to said recordings despite an unquestionable duty to hand them over, who are now seeking to have this Court 'bless' their desire to listen to these recordings in total (and in certain instances bless their desires to listen to certain recordings *again*), or the Defendants themselves?"   The answer is clear. However, there are certain matters, namely the terms of art being used by the prosecution to refer to the status of said recordings, that must and should be answered as well.

1.    Terminology, and the need for clarity about the nature of the recorded calls and of the protocols that the Government followed.

In order to answer the questions before it, the Court should start by insisting that the Government provide clear answers to more basic questions that will allow the Court and the defendants to know what the subject recordings are, and by what process they were created.  Only by getting answers to those questions, first, can the Court know what types of conversations the Court is being asked to address, and what the Government

already knows about their contents.  That will require that the Government make clear, to the Court and to the defendants, exactly how it has used certain potentially ambiguous terms, both in the filings related to the wiretap authorizations, and in discussions following the indictment in this case.

The terms that need to be understood, and the things that need to be made clear about the Government's protocols thus far, include the following concepts.

### Interception

First, there is the term "interception": the interception of communications.  Either listening (including real-time monitoring) or recording counts as intercepting.  *See* 18 U.S.C. § 2510(4) ("'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.")

### Pertinent and non-pertinent

One recurring distinction that is made, under wiretap caselaw, is the distinction between "pertinent" and "nonpertinent" communications.  This distinction has its roots in the principle that the purpose of an authorized wiretap is to intercept and record certain specified kinds of communications about specified offense conduct that has been disclosed with particularity to the authorizing judge.  *See* 18 U.S.C. § 2518(1)(b) (requiring very particular justification, in application for wiretap authorization); § 2518(3) (allowing Judge to authorize wiretap upon findings regarding (among other things) "particular offense" and "particular communications concerning that offense"); § 2518(4) (requiring statement in wiretap authorization concerning these particulars).  The

4

wiretap law seeks to balance this law enforcement interest, against the privacy interests that wiretaps so deeply implicate.

Wiretap authorizations are therefore not blanket warrants to listen to, and to record, every communication over a given phone. In fact, the law specifically requires that, as to conversations that do not pertain to the offense conduct allegedly at issue, *every* wiretap authorization must make explicit that the Government has the duty to intercept as few of those conversations as reasonably possible. This is known in the law as the duty to "minimize" interceptions. *See* § 2518(5) ("Every order and extension thereof shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter"). The statutory goal is to minimize the intrusion on privacy. As stated in *U.S. v. Hyde*, 574 F.2d 856, 869 (5th Cir. 1978) (binding in Eleventh Circuit), the statute "require[s] that the intrusions of the privacy of those whose communications are intercepted to be held to a minimum (consistently with the purposes of the wiretap)."

This is where the distinction between "pertinent" and "nonpertinent" comes from. The "pertinent" conversations are the ones that the authorization was targeted towards. They are the purpose of the wiretap. The Government always has the duty, under § 2518(5), to minimize the interception of "nonpertinent" communications. Because "intercept" means either listening or recording, the Government's duty is not just to have the agents take the headphones off while still recording, so that the Government lawyers

5

can argue about the nonpertinent tapes later; the duty is, to the extent reasonably possible, not to record them either. That is the plain meaning of § 2518.

The law recognizes that perfection is impossible. *See*, *e.g.*, *U.S. v. Suarez*, 601 F.3d 1202 (11th Cir. 2010). Agents cannot always tell at the very outset of a phone call whether it is "pertinent" or not. Some calls might even end before the agent can tell what they were about. But the law requires reasonable effort, in real time, to determine what calls are "pertinent" and to stop listening to or recording those that are not. What is to be done is what was done, for instance, in *Hyde*: once the listening agents determined that the call was not about criminal activity, "the tape was then shut off." *Hyde*, 574 F.2d at 869. It is not permissible to keep recording and sort things out later. *See U.S. v. Simels*, 2009 U.S. Dist. LEXIS 56732, *9-10 (E.D.N.Y. 2009) ("By definition, an agent cannot minimize the *interception* of communications that should not be intercepted by intercepting all communications and sorting them out later.") (emphasis in original).

Thus, once the agent recognizes that a given call is "nonpertinent" – even if that takes a minute or so – the recording should stop. It is not just that the real-time listening should stop, but also the recording – since, again, "interception" includes recording, and the duty is to minimize the interception of nonpertinent conversations.

One of the things that the Court should learn before ruling on the present matter is whether the Government agrees with the paragraph immediately above, and whether the Government did that in this case. Did it stop recording calls, once the monitoring agent realized that they were nonpertinent?

Statements by Mr. Ainsworth at the October 15 conference with the Court seemed to suggest, to the recollection of undersigned counsel, that the Government may not have done this. The Government's wiretap applications, and the orders that it prepared for the Judge's approval, also seem to indicate that the Government may have intentionally continued to record conversations even after recognizing that they were nonpertinent. The Government did not tell the Court that this was its intent, but there is just enough creativity in the language that a very attentive reader will draw this inference.

This inference is drawn from the fact that the Government sought and received the Judge's approval for language that called for agents to stop "monitoring" conversations when it was determined that they were nonpertinent – but which, in the next sentence, called for the suspension of "interception" of a conversation in more limited circumstances (i.e., for Mr. McGregor's phones, if neither he nor any so-called "confederate" was even a party to the conversation). *See* Doc. 1 (application) at pp. 8-9, Doc. 2 (authorization) at p. 6, Doc. 11 (application for continued authorization) at pp. 12-13, Doc. 12 (order of continued authorization) at pp. 8-9, all in Case No. 10-1959; Doc. 1 (application) at pp. 12-13, Doc. 2 (authorization) at pp. 8-9, in Case No. 10-1987. Unless the Government was being imprecise in its use of the words "monitoring" and "interception," there is a difference between those two words – and there is, therefore, an inference to the careful reader that the Government was continuing to "intercept" (i.e., record) conversations that it already knew it should stop "monitoring" (i.e., listening in real time) because they were nonpertinent.

*Minimize*

7

The duty under the law is to "minimize" the interception of communications that are not within the authorized purpose of the wiretap.  *See* § 2518(5) (wiretap "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter").

In its filings relating to the wiretaps in this case, the Government used the word "minimize" in a somewhat different sense, and it is very hard to know what the Government was using the word to mean.  The Government spoke of minimizing <u>calls or communications themselves</u>, rather than speaking in terms of what the statute speaks of, which is minimizing <u>interception</u>.  This use of the term is seen in the caselaw sometimes, but it is still ambiguous.  What did it mean, in the procedure as used in these wiretaps, to "minimize" a call?  Did it mean only a cessation of real-time monitoring?  Or did it also include a cessation of recording (or a protocol for not recording certain calls, such as calls to or from certain numbers, at all)?  The Court should inquire, and make sure that it is understood, what the Government means by this use of the word.  Only by doing that, as noted above, will the Court be able to know the nature of the tapes that the Court is currently being asked to make a ruling about.

### *Privileged vs. Non-Privileged*

Finally, there is the matter of privileged conversations.

The applications and orders themselves made no provision regarding privileged communications.  The Government did not seek permission in any application, and did not get permission in any court order, to record privileged conversations.  In other cases, the Government has addressed such matters in the application itself.

The very last paragraph of the affidavit in support of the first application, in No. 10-1959 (Doc. 1-3, pp. 70-71), said that agents would be instructed to "minimize" any conversation that was privileged. A reasonable reader would presumably understand the word "minimize" to mean a cessation not only of real-time monitoring, but of recording as well. But it is not clear that this is what the affiant, or the Government, meant, as we have noted above. The same was true again of the 106-page affidavit in support of the request for continued authorization in No. 10-1959 (*see* Doc. 11-4).

The first 10-day report in No. 10-1959 (Doc. 6, at pp. 9-12) gave what the Government called an "overview" (p. 12) of how the Government was handling privileged conversations. It is hard to know what the Government was saying in this passage. It is, for instance, unclear from this "overview" whether the Government was continuing to record conversations once it realized they were privileged. The "overview" focuses on whether the Government continued to "monitor" them, and again a possible inference from the careful use of that term "monitor" is that the Government was continuing to record conversations even when it was not "monitoring" them. But the Government did promise the Court that no one other than a select few would listen to any conversation with an attorney, and the Government further promised the Court that it was using a "taint team" which would listen to conversations with known attorneys only if there was cause to believe that the privilege was lost through the crime-fraud exception to the privilege. (p. 11, ¶¶ 21-22).

The second 10-day report in No. 10-1959 (Doc. 9) likewise mentioned the awareness that some calls were privileged, and mentioned that there was a protocol for

9

"minimizing" them.   Again the Government did not say explicitly whether it was continuing to record conversations once it realized they were privileged; and it did not seek, or get, Court authorization to do so.

2.     The Court should order the Government to turn over to Mr. McGregor *all* recordings of communications on his telephones, immediately.

The Court should order the Government to provide to Mr. McGregor the recordings of all conversations that were intercepted on his telephone lines, immediately. There is no legitimate reason for withholding those recordings from Mr. McGregor.  And there are several legitimate reasons why the Court should order such disclosure, both under Rule 16 (including Rule 16(a)(1)(B)) and under 18 U.S.C. § 2518(8).  These were Mr. McGregor's own conversations.  It will take a very substantial amount of time and resources for him to review these recordings of privileged and nonpertinent communications, just as it is already taking a very substantial amount of time to review the recordings that the Government has already turned over.  These privileged and nonpertinent records may well be useful to his defense in various ways.  They may be helpful as evidence to support a motion to suppress the wiretap evidence, under § 2518(10), if for instance they show that the Government continued to record information that it should not have recorded.  The privileged ones may contain information that will be useful to Mr. McGregor's own defense.  They may be useful in other ways as yet unknown; and there is no conceivable reason why the recordings of Mr. McGregor's own conversations should be kept from him.  We do not believe that the Government even

10

disputes the proposition that Mr. McGregor is entitled to these recordings. He should receive them immediately.

3. <u>The Government should not be permitted to have its agents listen to calls that the Government already categorized and set aside as "nonpertinent" or as "privileged."</u>

There is no reason to allow the Government to listen to, or even possibly to disseminate, recordings that the Government itself has already recognized as "nonpertinent" or "privileged." Any such action would be exactly what the wiretap law is designed in large part to prevent: an intrusion by Government agents into the privacy of conversations that are not within the intended targeted focus of an authorized wiretap.

At some points in discussion on this matter, the Government seemed to be taking the position that it is necessary to review all of the nonpertinent and/or privileged calls again, in order to determine whether there is *Brady* or *Giglio* material in them. (This justification would only make sense if there were some reason to believe that there was *Brady* or *Giglio* material for a defendant other than the one whose phone was tapped; if the concern is for the one whose phone was tapped, the answer is (as noted above) to turn over the recordings to that person forthwith.) The Government thus tries to set up a clash between Mr. McGregor's privilege (his attorney-client privilege and his spousal privilege) and his privacy interests on the one hand – and, on the other hand, the hypothetical possibility that some privileged or nonpertinent conversation will be relevant, admissible, and helpful to some other defendant.

11

As to the nonpertinent conversations, the question of whether there is any reason to let the Government listen to the recordings practically answers itself. These communications were deemed nonpertinent by the Government's own agents, the Government has offered no reason to believe that its agents were too free with the designation of nonpertinence,[1] and so there is no reason to suspect that there is anything relevant to this case in them. There is no reason to think that they have *Brady/Giglio* value. They are, by the Government's own judgment, nonpertinent – they do not concern the matters under investigation.

If the Government did what it was legally required to do as discussed above, which is stop recording when the monitoring agent realized the conversation to be nonpertinent, then these are all recordings that a Government agent has already once listened to in their entirety, in real-time. That Government agent made the judgment then that there was nothing in the recording that had to do with the matters at issue here. There is no reason to allow a Government agent to listen again. That would be a gratuitous breach of the privacy interests that the law was set up to protect.

If on the other hand the Government is actually seeking the Court's permission to listen to recordings where the <u>monitoring</u> stopped because of nonpertinence but the <u>recording</u> continued (in violation of the minimization duty as discussed above), then the

---

[1] Among the "pertinent" calls, in the estimation of the Government, are some that quite obviously have nothing to do with this case – purely social discussions involving people who have nothing to do with this case, and the like. If these were designated "pertinent" by the monitoring agents, one can reasonably expect that the ones designated "nonpertinent" are miles away from being relevant to any aspect of any other defendant's defense in this case.

Court certainly should not allow such an end-run around the statutory duty of minimization. That would be a fishing expedition into nonpertinent communications, the very sort of thing that the wiretap law was meant to avoid.

As to the privileged conversations, if the Government again did what it should have done, which is to stop recording (or not record at all) as soon as its listening agents knew that it was a privileged conversation, then again there is no reason whatsoever to think that there is anything of use to any co-defendant on any recording. A hypothetical clash of privilege versus *Brady/Giglio* could only occur if the Government was taping substantial amounts of privileged conversations. In the event of such a hypothetical clash, Mr. McGregor's attorney-client privilege would have to be honored. There is no "*Brady/Giglio*" exception to the attorney-client privilege; our research has found no case even suggesting that there is such an exception. If the Court did allow one defendant to use another's attorney-client privileged communications over his objection, then trial severance would surely be necessary. But there is no need for the Court to opine on that hypothetical scenario now.

If the Government recorded some substantive attorney-client discussions that it has already listened to, then it can tell the Court based on its own knowledge whether it thinks that there is *Brady/Giglio* material in them. If the Government says that there is, then the specifics of the matter can be taken up with a due concern for privilege and privacy, and in a way that ensures that the Government's trial team does not learn of any privileged communication.

13

If the Government tells the Court that it has recorded possibly substantive attorney-client communications that no Government agent has yet listened to, then the first order of business will be to determine why the Government did that, and what the consequences to the Government should be. But one thing is for certain: this invocation of *Brady/Giglio* concerns by the Government is no reason to allow any Government agent, not even a so-called "taint" team, the right to listen to privileged communications with court approval now. Privileged conversations retained their privileged status, and the privilege should be honored, even after those conversations are intercepted. *See* 18 U.S.C. § 2517(4) ("No otherwise privileged wire, oral, or electronic communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character.") Wiretap matters should be arranged so as to reduce rather than multiply the opportunities for Government agents to listen to privileged communications.

> This Court agrees with Defendant Renzi that liberal use of taint teams should be discouraged because they present "inevitable and reasonably foreseeable risks that privileged information may be leaked to prosecutors." (Renzi's Objection at 25 (citing In re Grand Jury Subpoenas, 454 F.3d 511, 523 (6th Cir. 2006)). "That is to say, the government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations." Id.

*U.S. v. Renzi*, 2010 U.S. Dist. LEXIS 56092, *26 (D. Ariz. 2010).

If the Government is holding recordings of more than a few seconds' duration of privileged conversations, that is inappropriate; the Government should not have made those recordings. The Court should not allow the Government to magnify the injury by having its agents listen (or listen again) to conversations that should have remained

entirely private. The government has not cited to, and we expect that it will not cite to, any case law to suggest that evidence the government improperly obtains through an invasion of the attorney-client privilege is evidence in its possession for *Brady* or *Giglio* purposes. Of course, further disseminating the defendant's attorney-client privileged communications to third-parties would only magnify the damage caused by the invasion of the privilege. Instead, the remedy for such an invasion of the privilege is to return the privileged communications to the privilege holder such that they are no longer in the government's possession at all and so that the privilege remains intact. The Court should not displace the privilege-holder and put the Government in the position of deciding who else should have access to privileged communications. Such a remedy does not protect the private and privileged nature of a person's discussion with his or her counsel, it ensures that others will listen in on those conversations. Nothing in *Brady* or *Giglio* compels the government to magnify the harm it causes by invading the attorney-client privilege in such a manner.

Likewise, if the Government argues that it ought to have some of its agents listen (or listen again) to privileged conversations to determine whether the crime-fraud exception to the privilege may apply, the Court should reject that effort. In those very limited situations where it is appropriate to pierce the privilege in order to determine whether the crime-fraud exception applies, that is done by the Court *in camera*, not by a party. And that is done only when there is evidence, from a source other than the attorney-client communication itself, giving *prima facie* reason to believe that the crime-fraud exception applies. The Supreme Court has held that "only non-privileged material

15

may be used to make the threshold determination that triggers in camera review." *In re John Doe*, 13 F.3d 633, 636 (2d Cir. 1994) (citing *United States v. Zolin*, 491 U.S. 554, 574 (1989*)); see Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1416-17 (11th Cir. 1994) (affirming trial court's refusal to hold in camera hearing because threshold for examining privileged materials was not met).  The Court should not allow the Government to review privileged materials in a way that bypasses the standards that the Supreme Court has set.  The Government seeks to do away with any requirement that it provide a factual basis before potentially privileged documents are examined, and move directly into a review of the potentially privileged documents themselves.  The Government furthermore seeks to review the materials itself, rather than have the Court do so *in camera*.  The Government's approach is highly inappropriate.

4.   McGregor's proposal for disposition of recording not yet turned over

Regardless of what is in the hands of the Government at this time, whether it be *portions* of recorded communications that have already been listened to by Government agents (which might lawfully exist as the Defendants recognize that some portion of most calls might be monitored in order for the government to determine if said call is "privileged" and/or "nonpertinent" and thus should cease to be intercepted), or communications in their entirety which the Government monitored for a brief moment, determined were either "privileged" and/or "nonpertinent" then stopped "monitoring" but continued to intercept/record in full (which should not under any circumstance exist), such recordings should immediately be turned over to the Defendants, and the

16

Government should be barred from listening to same.   If these calls are in fact "privileged" and/or "nonpertinent" as the Government has deemed them unilaterally to be, then the Government has already listened to whatever portion they might legally be entitled to listen to.   Under no set of circumstances should the Government be allowed to re-listen to any call or portion thereof that they themselves have already determined they should not be listening to.   The Government certainly should not be allowed to listen to portions of recordings that were "intercepted" but not "monitored" (in direct violation of the "minimization" requirement discussed above) in an attempt to second-guess the original monitoring agent and find some basis to re-categorize a protected communication as a non-protected one.

If the Defendant who receives recordings of his own conversations finds reason to believe, on review, that any of them are actually "pertinent" and "non-privileged," then that matter can be taken up in due course if that hypothetical comes to pass.  But there is no evidence at this point that the Government listening agents were too free with their designation of nonpertinence or privilege, and so there is no basis upon which the Court should give the Government the permission to listen to those conversations that are entitled to be kept private under the law.

Respectfully submitted,

_/s/ Joe Espy, III_
Joe Espy, III (ASB-6591-S82J)
One of the Attorneys for Milton E. McGregor

OF COUNSEL:

Benjamin J. Espy (ASB-0699-A64E)
William M. Espy (ASB-0707-A41E)
MELTON, ESPY & WILLIAMS, P.C.
P.O. Drawer 5130
Montgomery, AL 36103
Telephone:  334-263-6621
Facsimile:  334-263-7252
jespy@mewlegal.com
bespy@mewlegal.com
wespy@mewlegal.com

Fred D. Gray (ASB-1727-R63F)
Walter E. McGowan (ASB-8611-N27W)
GRAY, LANGFORD, SAPP
 McGOWAN, GRAY, GRAY
 & NATHANSON, P.C.
P.O. Box 830239
Tuskegee, AL 36083-0239
Telephone: 334-727-4830
Fax: 334-727-5877
fgray@glsmgn.com
wem@glsmgn.com

Robert D. Segall (ASB-7354-E68R)
David Martin (ASB-7387-A54J)
Shannon Holliday (ASB-5440-Y77S)
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, Alabama 36101-0347
Telephone: 334-834-1180
Fax: 334-834-3172
segall@copelandfranco.com
martin@copelandfranco.com
holliday@copelandfranco.com

Sam Heldman (ASB 3794 N60S)
THE GARDNER FIRM, P.C.
2805 31st Street NW
Washington, DC 20008
Telephone:  (202) 965-8884
Fax:  (202) 318-2445

18

sam@heldman.net

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Joe Espy, III
*Of Counsel*